UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| In Re Application of Melanie Anne Chen Pursuant to Title 28, United Code Section, Section 1782 | : : : : : | Misc. Action No. 20-21 (RC) |

**MOTION TO COMPEL**

Now into court, through undersigned counsel, comes Melanie Anne Chen (hereinafter "Ms. Chen" or "Applicant"), and files this Motion to Compel a response to two June 1, 2020 Commissioner's subpoenas *duces tecum* to McLarty Associates LLC ("McLarty") and Richard Reeves Burt ("Burt") pursuant to Rule 37(a) of the Federal Rules of Civil Procedure. Pursuant to Rule 37(a)(1) of the Federal Rules of Civil Procedure and Local Civil Rule 7(m), counsel for Applicant and counsel for McLarty conferred to resolve the disputes arising from the non-production of certain documents as well as redactions of many documents provided to Applicant on June 8, 2020 prior to the filing of this Motion. Not all issues were completely resolved and thus Applicant files this Motion to Compel.

**FACTS**

**A.     Factual Background Surrounding U.K. Litigation**

Ms. Chen is involved in a litigation pending before the High Court of Justice, Business and Property Courts of England and Wales, Commercial Court, Queen's Bench Division, to wit; *KMG International NV v. Melanie Anne Chen and Chipper Management Limited*, Claim No. CL-2017-000753 (the "U.K. litigation"). The U.K. litigation goes to trial on July 6, 2020. The U.K. litigation evolves, in part, from the transfer of commercial holdings after the death of one Dan (also known as "Dinu") Costache Patriciu ("Mr. Patriciu"), a wealthy Romanian businessman.

On 19 August 2014, Mr. Patriciu died and the beneficiaries of his estate (the "Estate") included his two daughters, Ana Patriciu and Maria Patriciu.

More specifically, the U.K. litigation flows from circumstances surrounding the alleged transfer of one commercial enterprise to Ms. Chen's and/or Ana Patriciu's constructive control, a fact disputed by Ms. Chen, and the subsequent monetization of that company. Ms. Chen denies she was materially involved in any such transfers, but in the U.K. litigation the claimant, KMG International NV ("KMG"), has leveled some serious accusations against Ms. Chen. At bottom, KMG challenges the timing and circumstances around the transfers of ownership in a German company, Novero GmbH ("Novero") that was a sub-sub-subsidiary of Mr. Patriciu's Swiss holding company, DP Holding SA ("DPH")[1]. DPH was the company Mr. Patriciu set-up to hold the many corporate assets owned by Mr. Patriciu. Mr. Patriciu owned 100% of DPH's shares prior to his death on 19 August 2014. KMG more or less argues Novero was "dissipated" by Ms. Chen in a concerted effort to harm KMG's financial interests.

In the U.K. litigation, KMG alleges that Ms. Chen and an entity that she directs, namely, co-defendant legal entity called Chipper Management Limited ("CML"), more or less, as directors, or *de facto* directors, engaged in a series of transactions ultimately transferring the assets and shares in Novero to Laird Plc, a United Kingdom company. Laird Plc is a publicly-traded technology company on the London Stock Exchange that provides systems, components and solutions to the automotive industry. KMG alleges that this final transfer of Novero involved a value-transfer of €65 million or roughly $72 million[2]. The actual payment Laird Plc made for

---

[1] Novero, as well as some other companies in the DPH structures, were held and controlled by Novero Investments B.V. ("NIBV"), a company incorporated under the laws of the Netherlands. NIBV, at one point, was owner of 100% of the issued share capital of a number of subsidiaries, including the shares of Novero GmbH.
[2] As the exact dates of transactions and valuations of Novero are much disputed in the U.K. litigation, the average exchange rate in 2015 was $1.11 U.S. dollars for €1 Euro.

its acquisition of Novero allegedly was £39.4 million in cash and £10.4 million in Laird Plc shares, or about $72 million in total. KMG further alleges the Laird Plc payments were made to entities and structures controlled by and for the benefit of Ana Patriciu and Ms. Chen.

In the U.K. litigation KMG alleges that Ms. Chen and CML are responsible for setting-up this series of transfers that ultimately resulted in the sale of Novero to Laird Plc for which the original controlling shareholder of Novero, namely, NIBV, received "no consideration" and thus transferred Novero and all of its assets from DPH to Laird Plc in a deceptive manner. KMG more specifically alleges that Ms. Chen and CML violated tortious duties under Dutch law[3] and that as directors, or *de facto* directors, they violated legal duties they owed to NIBV when they approved deals for "no consideration" as allegedly occurred in the initial transfer of Novero shares in September 2014.

Finally, KMG alleges that Ms. Chen, CML and, by implication, Ana Patriciu, were part of a conspiracy to prevent KMG collecting on a $200 million USD (plus interest and costs) arbitration order obtained by KMG against DPH and/or the Estate on 30 April 2016. KMG's arbitration award arose out of a share sale and purchase transaction of a DPH controlled entity completed during the period 2007 to 2009, when Mr. Patriciu still ran and owned DPH. In particular, KMG, via a company with which it subsequently merged, acquired from DPH an energy company known as The Rompetrol Group N.V. ("Rompetrol"). Rompetrol runs oil and gas operations in Eastern Europe, but primarily in Romania. KMG acquired Rompetrol for $ 1.75 billion USD.

In 2006 the government of Romania initiated criminal proceedings against Mr. Patriciu and others alleging, among other things, that Mr. Patriciu and the other defendants had

---

[3] In the U.K. litigation the application of Dutch or English law to some legal issues in the matter is also disputed by the parties.

"embezzled" monies from the Romanian State. The embezzlement was said to arise from the failure of one of Rompetrol's subsidiaries, Rompetrol S.A., to pay $58.5 million it had received under a contract with a company called Repsol S.A. to the Romanian State. Rompetrol S.A. was joined to the criminal proceedings as a civil party for the purposes of recovering this $58.5 million plus interest in the event there was a conviction of the relevant criminal defendants.

In an August 2012 decision, the Romanian court of first instance dismissed the criminal charges and ruled that Rompetrol had no outstanding liabilities to the Romanian state. However, in October 2014, a few weeks after Mr. Patriciu passed away, a Romanian court of appeal reversed the trial court's decision, and Rompetrol was found liable to the Romanian State for approximately $58.5 million USD, plus interest. According to KMG's allegations in the U.K. litigation, Rompetrol's liability to the Romanian state, with interest, has ballooned to approximately $119 million USD. The share transfer agreement between DPH and KMG's successor for the Rompetrol shares contained an indemnity agreement in which DPH had to indemnify KMG for any liability arising out of these Romanian criminal proceedings. KMG initiated arbitration proceedings against DPH and the Estate in late November 2014 for indemnity after Rompetrol had been found liable by the Romanian court of appeal.

**B.**     **Discovery Efforts Pursuant to Title 28, United States Code, Section 1782**

On March 19, 2020 Applicant, pursuant to Title 28, United States Code, Section 1782, filed an *Ex Parte* Application asking this Honorable Court to issue an Order permitting Ms. Chen to collect evidence for potential use in the U.K. litigation. On May 1, 2020 this Court entered an Order granting the Application and appointed undersigned counsel as Commissioner. Doc. No. 6. That Order, with this Court's permission, was served upon Burt and McLarty via e-mail on June 6, 2020.  Starting on May 7, 2020, undersigned counsel was engaged in a series of

communications with Leslie Kiernan, who represents McLarty. It was agreed that rather than issue any formal subpoenas and incur additional expenses, McLarty would provide documents informally as is permitted under Title 28, United States Code, Section 1782(b). However, after attempting to engage in informal document discovery for over three weeks, initial feedback indicated that Applicant would not obtaining a full disclosure of e-mail communications[4] and there arose a questions as to who maintained certain business documents but not others. With a trial rapidly approaching, time was of the essence and on June 1, 2020 undersigned counsel issued two subpoenas *duces tecum*, one to McLarty and one to Burt[5], in what were basically identical requests asking for the same information. Exhibit 1, Subpoenas to McLarty and Burt. Returns for those subpoenas were due on June 8, 2020. *Id.*

On June 8, via e-mail, counsel for McLarty provided Applicant 37 pages of documents, with various portions of many documents redacted, providing an affidavit by Burt certifying the produced records were his business records, and a cover letter raising objections to the production of other documents in either Burt's or McLarty's possession. Exhibit 2, Cover letter and production of Burt's business records. That same day, undersigned counsel sent an e-mail to

---

[4] Applicant, as part of the U.K. litigation, has received copies of approximately 50 e-mails between Burt, Gretchen King and others that would have been responsive to the June 1 subpoenas issued to McLarty and Burt. During the informal discovery efforts McLarty's e-mail searches turned-up no responsive e-mails. Ultimately, only two e-mails between Vantage and Burt were produced by Burt or McLarty as e-mails found in the local drive of Burt's secretary at McLarty. It remains unclear why no other e-mails were found. Exhibit 2 production p.p. 20 and 27.

[5] When dealing with Ms. Chen it appears that Burt was doing business as "Burt & Associates." However, Burt did this type of work on McLarty's premises, used his McLarty e-mail address to communicate with clients of Burt & Associates, and even used McLarty's business address as Burt & Associates business address. Counsel for McLarty claims the businesses are separate and they may be for income distribution and tax purposes, but Applicant maintains that McLarty has custody and control over some business records it maintained on Burt's behalf, in particular, all of e-mail correspondence, even if they do not pertain to work done for McLarty. *See* Exhibits 3 and 4. It does not appear that Burt has access to his archived e-mails only McLarty does.

counsel for McLarty indicating the objections to discovery and extensive redactions were unfounded as well as seeking clarification on other issues raised in the cover letter including clarity on the reasoning behind the various redactions. Exhibit 3, Applicant counsel's e-mail of June 8, 2020. McLarty's counsel was given a deadline of close of business June 9, 2020 to reply to that written demand for the production of additional information. *Id.*

Counsel for Applicant received an e-mail reply from McLarty's counsel on June 9, 2020 as requested. Exhibit 4, McLarty counsel's reply of June 9, 2020. It refuted most of the arguments Applicant made for production of certain items. *Id.* On June 10, 2020 undersigned counsel sought further clarification of the June 9, reply, in particular the lack of e-mails and whether any e-mails Applicant had in its possession referred to any of the withheld documents in Mr. Burt's possession. Exhibit 5, Applicant counsel's e-mail of June 10, attachments omitted. On June 12, 2020 counsel for McLarty replied. Exhibit 6, McLarty Counsel's Reply of June 12, 2020. Unfortunately, the replies did not address all issues in dispute and Applicant files this Motion to Compel for a further and more complete production of documents from Burt and/or McLarty. On June 12, 2020, undersigned Counsel as Commissioner issued a deposition subpoena for a deposition of Burt scheduled for June 26, 2020. Exhibit 7, Burt Deposition Package.

Through counsel for McLarty, Burt, doing business as Burt & Associates, objected to the production of three previously unidentified items based upon a non-confidentiality provision in an agreement Burt, in his personal capacity, executed with Vantage Intelligence ("Vantage"). Exhibit 2, cover letter at p.p. 1 and 2 and document production at p.p. 33-35. The Non-Disclosure Agreement ("NDA") between Burt and Vantage, a British Virgin Island Company, was executed on August 8, 2016. *Id.* document production at p. 33. The NDA forms the basis of

Burt's refusal to provide three sets of documents responsive to his June 1, 2020 subpoena. Exhibit 2, cover letter p.p. 1 and 2. The NDA requires Burt to hold "Confidential Information" in the "strictest confidence" and "take all reasonable measures to protect the Confidential Information." Exhibit 2, production at p. 33. Moreover, the NDA provides Burt specifically may not disclose "Confidential Information" to Ms. Chen. *Id.* On June 9 and 12, 2020, counsel for McLarty provided more detail regarding the three withheld hard copy documents based upon the NDA and described them as follows: (1) background memorandum regarding Bucharest Court of Appeal decision; (2) e-mail correspondence from G. King to R. Burt enclosing litigation filings[6]; and (3) background memorandum regarding M. Chen. Exhibit 3 at p. 1 and Exhibit 6[7]. On June 12, counsel for McLarty confirmed that none the three sets of documents withheld by Burt appear to be documents that were mentioned in e-mails between Vantage employee Gretchen King and Burt that are already in Applicant's possession via disclosures made by KMG in the U.K. litigation. Exhibit 6. The three sets of documents likely refer to other Vantage documents not disclosed in e-mails Applicant received form KMG in the U.K. litigation.

In the U.K. litigation KMG alleges that Ms. Chen liquidated the Novero assets one month before the Romanian appellant decision of October 2014. Furthermore, KMG alleges this

---

[6] Unclear how litigation filings can be "confidential" as they would most likely be publicly available.

[7] Counsel for McLarty designates withheld items 1 and 3 as "work product." Exhibit 4 at p. 1 ¶ 2. Burt did not create these documents thus they cannot be his work product. Moreover, Rule 26 of the Federal Rules of Civil Procedure, which includes how one must deal with work product in U.S. litigation, should not apply to documents produced for a U.K. litigation. Only U.S. privilege law limits what foreign litigants may obtain under Section 1782. According to U.K. counsel for Applicant, unlike in United States civil cases, in the U.K. work product generated by non-lawyers, like Vantage, is subject to discovery and can be admitted into evidence. Section 1782(a) only adopts the Federal Rules of Civil Procedure on how "the testimony or statement shall be taken, and the document or other thing produced . . . ." Section 1782 was not intended to inject all U.S. discovery obligations and limitations set forth in the Federal Rules of Civil Procedure into foreign legal proceedings, such as those set forth in Rule 26, but just to provide the process for collecting relevant evidence.

appellate ruling was "reasonably in prospect" in September 2014. Therefore, Ms. Chen's and the Estate's transfer and sale of Novero to Laird on September 10, 2014 is cast as an attempt to dissipate DPH assets in anticipation of that adverse judgment. Central to Ms. Chen's defense is whether or not the monetary judgment issued by the Romanian appellate court against Rompetrol was "reasonably in prospect." Any documents which show that, prior to October 2014, KMG did not anticipate that the appeal of Romanian criminal action would result in a liability to Rompetrol would undermine KMG's position that Ms. Chen should have anticipated such a judgment. The three documents withheld by Burt or McLarty may contain frank assessments of KMG's state of mind leading up to the October 2014 appellate decision.

## LAW AND ARGUMENT

According to Title 28, United States Code, Section 1782(a), any person seeking evidence for use in a foreign legal proceeding may obtain all evidence that would be available using the procedures set forth in the Federal Rules of Civil Procedure, however, a person located in the court's district may not be compelled to provide testimony or documents "in violation of any legally applicable privilege." 28 U.S.C. § 1782 (a). Even though the NDA requires Burt to keep matters confidential, it does not create a common law privilege over such information. "[A]s a general rule, 'confidentiality agreements will not stand as a barrier to discovery between two parties in litigation'". *Shvartser v. Lekser,* 270 F.Supp.3d 96, 98 (D.D.C. 2017), *quoting, Saini v. Int'l Game Tech.*, 434 F.Supp.2d 913, 922 (D. Nev. 2006).

Counsel for McLarty distinguishes *Shvratser* as being limited to discovery between parties in a litigation. Exhibit 4 at p.1, ¶ 2. However, there are several cases that involve requests for discovery to non-party witnesses, or persons not under investigation by a grand jury, who are also bound by various non-disclosure agreements or confidentiality obligations without such

provisions creating any privilege. *BLK Enterprises, LLC v. Unix Packaging, Inc. et al.*, Case No. CV 18-2151-SVW, 2018 WL 5993841 at *4 (C.D.CA) (Non-disclosure agreements between a party to litigation and third-party customers did not create a privilege that would preclude discovery from those entities). *Multiven, Inc. v. Cisco Sys., Inc.,* 2010 WL 583955, at *3 (N.D. Cal., Feb. 16, 2010)(Third-party subject to non-disclosure agreement with one of the parties to a litigation can be deposed and the existence of a NDA does not prevent discovery); *In re Grand Jury Subpoena*, 148 F.3d 487, 492 (5th Cir. 1998) (Grand jury subpoena to an agricultural mediation program was permitted even if confidentiality provisions in federal and state alternative dispute resolution statutes provided for confidentiality of mediations. '''Confidential' does not necessarily mean 'privileged.'''). The law is clear, NDAs do not create a privilege over information and documents covered by the NDA.

Counsel for McLarty also requested that any issues about the NDA be raised with D.C. counsel for Vantage. Exhibit 4 at p.2. However, Vantage is not located in this District and, pursuant Title 28 U.S.C. Section 1782, Vantage cannot be compelled to produce documents in this District as they are not found in this District. 28 U.S.C. § 1782(a)("The district court of the district *in which a person resides or is found* may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal . . .)(*emphasis provided*). According to the NDA, Vantage is a BVI company[8], whose documents are beyond the reach of this Court. Exhibit 2, production at p. 33. Applicant will serve counsel for Vantage with the is Motion to Compel.

In addition, certain redactions were made to responsive documents in Burt's possession based upon a need to protect the identity of Burt's other clients and his fee structure or, possibly,

---

[8] Vantage has offices in New York, London and Dubai. https://www.vantageintelligence.com

as containing information covered by the NDA. Again, this information does not fall under protected privilege and those redactions should be removed. For example, the timing of subsequent meetings with other clients may indicate which relevant meetings were cursory and which meetings lasted a long time and thus were meetings of substance.  This could be very relevant in deciding the areas and dates of inquiry during Burt's deposition.

Finally, it remains unclear to Applicant if McLarty failed to provide e-mails because it did not retain those e-mails, it simply relies upon the fact that the relevant e-mails are not parts of its business records and thus producing them would therefore be unduly burdensome or is due to the use of inadequate search parameters. See Exhibits 4, 5 and 6. Thus, Applicant would ask that this Court order McLarty to confirm that it has no copies of e-mails requested in the June 1, 2020 subpoena *duces tecum* issued to McLarty, explain why those records no longer exist, or are otherwise inaccessible.

We have set a deposition of Burt for June 26, 2020 at 9:30 a.m. and thus need a ruling on the production of the most crucial documents, the Burt documents currently withheld based upon the NDA, and other issues to properly cross-examine Burt at that time. Exhibit 7.

## CONCLUSION

Considering the above and forgoing, Applicant requests that its Motion to Compel be granted, that Burt and McLarty be required to produce the three documents withheld based upon the August 8, 2016 NDA between Burt and Vantage, as well as ordering Burt to remove any and all redactions of documents already produced whether based upon the NDA or based upon a need to protect the identity of Burt's clients or his fee structure, and that McLarty be ordered to explain why no responsive e-mails were found other than those located on a local drive of Burt's Secretary.

Dated: June 12, 2020.

                                        Respectfully submitted,

**BAKER DE KLUIVER PLLC**

_____/S/_____
Addy J. "Jack" de Kluiver
DC Bar #1046349
1101 New York Avenue NW, Suite 1000
Washington, D.C., 20005
jackdekluiver@bakerdekluiver.com
(202) 873-4008

*ATTORNEY FOR APPLICANT*

11

# Certificate of Service of Process

Considering that other than Applicant no other lawyers have appeared in this matter, the undersigned hereby certifies that, on June 12, 2020, a copy of this Motion to Compel, exhibits thereto and proposed order were served via e-mail on the following persons or entities:

Richard Reeves Burt
1532 31st Street NW
Washington, D.C. 20007
rburt@maglobal.com

McLarty Associates LLC
Leslie Kiernan, Kiernan PLLC
1717 K Street, N.W., Suite 900
Washington, D.C. 20006
lkiernan@kiernanfirm.com

Vantage Intelligence
Paul Rauser, Aegis Law Group LLP
801 Pennsylvania Avenue, N.W., Suite 740
Washington, D.C. 20004
prauser@aegislawgroup.com

**BAKER DE KLUIVER PLLC**

_____/S/_____
Addy J. "Jack" de Kluiver
DC Bar #1046349
1101 New York Avenue NW, Suite 1000
Washington, D.C., 20005
jackdekluiver@bakerdekluiver.com
(202) 873-4008

*ATTORNEY FOR APPLICANT*